CC-97-775                                                                1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Víctor L. Amador Parrilla<br>    Recurrido<br><br>   v.<br><br>Concilio Iglesia Universal de Jesucristo<br>    Recurrente | Certiorari<br><br>2000 TSPR 47 |

Número del Caso: CC-1997-0775

Fecha: 23/03/2000

Tribunal de Circuito de Apelaciones: Circuito Regional V

Juez Ponente: Hon. Carmen Ana Pesante Martínez

Abogados de la Parte Recurrente:    Lcdo. Edmundo Ayala Oquendo

Abogados de la Parte Recurrida:    Lcda. Joyce A. Pagán Nieves

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Víctor L. Amador Parrilla

Demandante-recurrido

v.                                    CC-97-775        CERTIORARI

**Concilio Iglesia Universal**
**de Jesucristo**

Demandado-recurrente

**Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LOPEZ**

**San Juan, Puerto Rico, a 23 de marzo de 2000**

**El Concilio Iglesia Universal de Jesucristo (Iglesia) es una corporación sin fines de lucro, creada el 2 de abril de 1938 y reorganizada el 12 de noviembre de 1972 bajo las disposiciones de la Ley General de Corporaciones, 14 L.P.R.A. 1101, et seq. Esta Iglesia se rige por el "Reglamento de la Institución" (Reglamento), el cual sujeta a sus miembros a la autoridad de una Junta Pastoral Internacional (Junta).**

**La Junta, a su vez, es la encargada de designar a los líderes de cada comunidad en donde están organizados sus templos. Por la naturaleza de la Iglesia, el Reglamento prohibe específicamente la existencia de subgrupos con personalidad jurídica separada dentro del mismo.**

Asimismo, como parte de aquello a lo que se obligan las personas o grupos que desean formar parte de la Iglesia, ésta siempre ha exigido que los miembros se sometan a lo dispuesto en su Reglamento.

Los hechos en este caso se remontan a 1977 cuando la Iglesia comenzó un programa de reclutamiento en el Barrio Navarro del Municipio de Gurabo, Puerto Rico. Dicho programa fue dirigido por Angel Martínez, uno de los pastores de dicha Iglesia. Un año después, el 9 de mayo de 1978, la Iglesia compareció como "comprador" en la Escritura Pública Número 37, otorgada por el notario Jaime Corujo Collazo, mediante la cual adquirió la parcela 526 del Barrio Navarro del mencionado Municipio[1]. Dicho terreno se adquirió con la aportación monetaria de los residentes del Barrio Navarro y de la Iglesia. Cada parte aportó la suma de dos mil dólares para llegar al precio total de venta de cuatro mil dólares ($4,000.00). La edificación que allí se levantó fue financiada, en su totalidad, por una aportación en dinero de los miembros de la congregación quienes pagaron los materiales y mano de obra de la estructura[2].

La aportación económica para esa construcción fue una adicional a la aportada por los miembros de la comunidad a la Iglesia, la cual continuaba recibiendo una aportación total de veinticinco por ciento de la cuota que exige el

---

[1] En dicha escritura, compareció como comprador el Sr. Nicolás Rosario y su esposa Ursula Díaz. Las partes estipularon, sin embargo, que estos compradores realmente comparecieron a nombre y en representación de la Iglesia en dicha escritura.

[2] Este hecho fue estipulado por las partes.

Reglamento de dicha Corporación[3]. Posteriormente, el 18 de julio de 1989, y mediante la Escritura Pública Número 17, otorgada ante el notario José Lebrón Soto, la Iglesia adquirió la parcela número 525 del Barrio Navarro, ubicada al lado del terreno previamente adquirido.

Resulta necesario señalar que la Iglesia aprobó su primer Reglamento --el cual, como expresáramos anteriormente, rige el destino de la misma y de sus feligreses-- con fecha de 15 de noviembre de 1970, sufriendo el mismo dos revisiones, a saber: el 28 de marzo de 1981 y el 1ro. de enero de 1990. Debemos enfatizar el hecho de que los tres (3) Reglamentos contienen una cláusula a los efectos de que los mismos tendrán vigencia desde de la fecha de su aprobación por la Asamblea de la Iglesia Universal de Jesucristo.

En fecha posterior a la construcción del templo en el Barrio Navarro, surgieron ciertas desavenencias entre la Iglesia y el líder, y pastor, de la mencionada comunidad, Víctor L. Amador Parrilla. Este último fue desautorizado por la Iglesia para continuar en sus funciones como tal pero, en lugar de abandonar su posición, éste recabó el apoyo de los feligreses del Barrio Navarro, los cuales le autorizaron continuar fungiendo como su líder espiritual. La controversia se agravó cuando Víctor Amador Parrilla decidió

---

[3] La comunidad aportaba al Concilio quince por ciento de las donaciones recaudadas anualmente de entre sus miembros. Adicionalmente se aportaba un diez por ciento de lo recaudado para un congreso particular dentro de la corporación.

continuar esa labor desde las facilidades construidas por la comunidad mientras los feligreses formaban parte de la Iglesia, de la cual, a raíz de esta controversia, se "desafiliaron".

Así las cosas, el 7 de julio de 1993, los miembros de la comunidad, organizados bajo el nombre de Iglesia Pentecostal Salvación Eterna, Inc., entablaron una acción de injunction posesorio, solicitud de sentencia declaratoria, accesión y daños y perjuicios en el Tribunal de Primera Instancia, Sala Superior de Caguas, contra la Iglesia Universal de Jesucristo. En esencia alegaron que la comunidad era copropietaria de la parcela número 525 adquirida por la Iglesia en la escritura pública de 1989. La comunidad planteó que dicha titularidad surgió debido a la aportación de, al menos, el setenta y cinco por ciento del total del precio de venta del terreno. Además, la comunidad argumentó que la estructura de cemento que allí se levantó fue costeada por ellos y que la poseyeron en calidad de dueños.

La Iglesia negó, inicialmente, que la comunidad aportara el setenta y cinco por ciento del precio del terreno en cuestión. Estos sostuvieron que la Junta Pastoral fue la que compró el solar con sus propios fondos. Asimismo, la Iglesia originalmente sostuvo que fue con fondos suyos con los que se compraron los materiales de construcción que sirvieron para hacer la primera planta de la edificación en disputa.

Ello no obstante, la Iglesia demandada luego aceptó, y estipuló, que la Parcela 526 se adquirió en 1978 con la aportación de dos mil dólares de los feligreses del Barrio Navarro y dos mil dólares pertenecientes a la Iglesia. También estipularon que el templo construido en dicha parcela fue costeado en su totalidad con las aportaciones de dinero que hicieron los feligreses. Además, admitieron que la parcela 525 se compró en 1989 con un préstamo de quince mil dólares del cual los feligreses pagaron trece mil dólares mientras la Iglesia aportó los restantes dos mil dólares.

El 15 de octubre de 1993, el tribunal de instancia permitió la presentación de una demanda enmendada en donde se alegó que la acción se radicaba tanto en relación con la parcela número 526 como para la parcela número 525. Como expresáramos anteriormente, en la primera parcela fue donde se construyó el templo, mientras que en la segunda había ya una edificación que servía de residencia al pastor.

El 26 de octubre de 1993, la parte demandada contestó la demanda enmendada y presentó una Moción Solicitando Sentencia Sumaria a la cual los demandantes se opusieron el 2 de noviembre de 1993. El 5 de noviembre de 1993, el entonces Tribunal Superior, Sala de Caguas, declaró no ha lugar la referida moción de sentencia sumaria.

Finalmente, tras un largo proceso de descubrimiento de prueba y celebración de vista en su fondo, el 24 de junio de 1997, el tribunal de instancia, dictó sentencia a favor de

la parte demandante. Dicho foro, en lo pertinente, resolvió que en cuanto a las dos parcelas de terreno en controversia lo que existía era una comunidad de bienes, entre la Iglesia y los feligreses del Barrio Navarro, razón por la cual la participación en dicha comunidad de cada una de las partes sería dividida en proporción a la cantidad de dinero aportada por éstas para la adquisición de las mismas; en relación al templo propiamente, el foro de instancia resolvió que el mismo le pertenecía, en su totalidad, a la congregación del Barrio Navarro, y no a la Iglesia, pues dicha comunidad había sufragado su construcción mediante aportaciones económicas que hicieron a esos efectos.[4]

---

[4] El razonamiento del foro de instancia se puede resumir de la siguiente manera: que aun cuando la constitución y reglamentos de una organización son el contrato que regula la relación entre dicha entidad y sus miembros, razón por la cual la relación entre las partes es una de naturaleza contractual y lo pactado tiene fuerza de ley entre las partes contratantes, en el presente caso se tiene que acudir, en forma supletoria, a las disposiciones del Código Civil por razón de no existir pacto contractual alguno sobre las materias en controversia; que en cuanto a los solares en controversia, no conteniendo el Reglamento aplicable disposición alguna sobre los mismos, son de aplicación las disposiciones del Artículo 575 del Código Civil, el cual regula la donación de cosa inmueble, requiriéndose la otorgación de una escritura pública; que no habiéndose otorgado la misma, y habiendo aportado ambas partes a la compra de éstos, la donación era inoperante, razón por la cual se estableció una comunidad de bienes, debiéndose liquidar la misma conforme a lo aportado por ambas partes.

En cuanto al templo propiamente, tratándose igualmente de una donación de bien inmueble y no habiéndose otorgado escritura pública, determinó el tribunal que el mismo pertenece a los feligreses por cuanto los gastos relacionados a su edificación fueron sufragados, en su totalidad, por la congregación del Barrio Navarro y no por la Iglesia.

Inconformes, los demandados apelaron ante el Tribunal de Circuito de Apelaciones. Allí, en esencia, plantearon los mismos errores que hoy traen ante nuestra consideración.[5] El referido foro apelativo intermedio dictó sentencia confirmatoria de la emitida por el tribunal de instancia. Un examen de la sentencia emitida por el referido foro apelativo demuestra que su razonamiento fue prácticamente el mismo al utilizado por el foro de instancia.

La parte demandada presentó recurso de Certiorari ante este Tribunal. En el mismo, le imputó al Tribunal de Circuito haber errado:

> "-Al no interpretar el contrato entre las partes limitándose a la interpretación literal de una de sus cláusulas.
> -Al no aplicar derecho positivo y la jurisprudencia interpretativa al Reglamento que es la ley entre las partes.
> -Al adjudicarle personalidad jurídica a los demandantes-apelados.
> -Al resolver que la controversia es una disputa entre dos entidades religiosas, cuando lo que se plantea en este caso es una interpretación contractual entre el Concilio y los miembros que este agrupa."

---

[5] "Erró el honorable tribunal al no interpretar el contrato entre las partes limitándose a la interpretación literal de una de sus cláusulas."

"Erró el honorable tribunal al no aplicar derecho positivo y la jurisprudencia interpretativa al Reglamento que es la ley entre las partes."

"Erró el honorable tribunal al adjudicarle personalidad jurídica a los demandantes-apelados."

"Erró el honorable tribunal al resolver que la controversia es una disputa entre dos entidades religiosas, cuando lo que se plantea en este caso es una interpretación contractual entre el Concilio y los miembros que este agrupa."

**Expedimos el auto**. Estando en posición de resolver el recurso radicado, procedemos a así hacerlo.

I

Antes de entrar en las consideraciones del caso de marras, debemos, en primer lugar, dejar claramente establecida la jurisdicción de los tribunales en las disputas habidas entre facciones dentro de una iglesia.

Sabido es que la jurisdicción de los foros judiciales en nuestro País está regida por nuestra Constitución y por la Ley de la Judicatura de 1994, según enmendada. Fundamentados en lo anterior, nuestros tribunales poseen jurisdicción general para resolver casos y controversias con la excepción de aquellas materias que les están vedadas por alguna disposición constitucional o estatutaria local o, en última instancia, por la Constitución de los Estados Unidos y los estatutos federales. <u>Díaz</u> v. <u>Colegio Nuestra Señora del Pilar</u>, 123 D.P.R. 765 (1989). Así pues, hemos dicho que en nuestro sistema de derecho los tribunales son el recurso más apropiado para resolver conflictos que surjan entre aquellos ciudadanos que no pueden ponerse de acuerdo con respecto a sus derechos bien sean estos personales o de propiedad. <u>Vélez Ruiz</u> v. <u>E.L.A.</u>, 111 D.P.R. 753 (1981); <u>Díaz</u> v. <u>Colegio Nuestra Señora del Pilar</u>, ante.

En el citado caso de <u>Díaz</u> v. <u>Colegio</u> aclaramos que los tribunales civiles no pueden ejercer su jurisdicción para dilucidar disputas sobre derechos de propiedad relativos a

una iglesia <u>cuando para hacerlo tengan irremediablemente que pasar juicio sobre materias de doctrina, de disciplina, de fe o de organización eclesiástica interna</u>. En dicho caso anticipamos que el problema constitucional que pueda surgir al momento de intervenir en una disputa entre grupos religiosos no depende de la naturaleza del derecho disputado, sino de la posible interferencia del Estado, a través de los tribunales, <u>en el corazón mismo de la religión</u>, materia totalmente ajena a la competencia de los tribunales. <u>Por lo tanto, lo que limita la facultad interventora de un tribunal no es el hecho de que las partes involucradas sean entidades religiosas sino el tipo de controversia que se trae ante la consideración del foro judicial</u>. Véase: <u>Mercado Rivera</u> v. <u>Universidad Católica de P.R.</u>, res. el 27 de junio de 1997.

Tanto la doctrina federal como la nuestra son cónsonas entre sí con respecto a la interpretación de la Cláusula de Separación de Iglesia y Estado y la Cláusula de Libertad de Culto que nos dirigen en torno al curso a seguir en este asunto. Ambas cláusulas deben ser consideradas por los tribunales los cuales deben limitarse a adjudicar aquellas controversias en las cuales no hay que intervenir con cuestiones de dogmas y principios religiosos. <u>Presbyterian Church in the United States</u> v. <u>Mary Elizabeth Blue Hill Memorial Presbyterian Church</u>, 393 U.S. 440 (1969); <u>Agostini Pascual</u> v. <u>Iglesia Católica</u>, 109 D.P.R. 172 (1979). Fundamentado en lo resuelto tanto por este Tribunal, como

por el Tribunal Supremo de los Estados Unidos, las determinaciones de los tribunales inferiores prevalecerán siempre y cuando se utilicen aquellos principios neutrales de derecho aplicables a la controversia. Díaz v. Colegio, ante.

Este criterio, conocido como la "doctrina de principios neutrales", y adoptada por el Tribunal Supremo de los Estados Unidos en el caso Watson v. Jones, 80 U.S. 679 (1871), se aplica también en Puerto Rico con el propósito de proteger los intereses de los ciudadanos al tiempo que se salvaguardan las garantías constitucionales. Agostini Pascual v. Iglesia Católica, ante; Díaz v. Colegio, ante; Academia San Jorge v. Junta de Relaciones del Trabajo, 110 D.P.R. 193 (1980).

En el presente caso estamos frente a una controversia sobre la titularidad de unos terrenos y un edificio. Nada en esta disputa obliga a este Tribunal a entrar en consideraciones relacionadas con la fe, dogma o creencias religiosas de los grupos que alegan tener derechos sobre dichas propiedades. Por lo tanto, la controversia no conlleva una intromisión excesiva del Estado en asuntos religiosos ya que, por el contrario, estamos frente a planteamientos de derecho que, lejos de obligarnos a pasar juicio sobre las creencias religiosas de cada grupo, nos dirigen meramente a la aplicación de las disposiciones neutrales de nuestro Código Civil.

II

La Iglesia sostiene que erró el Tribunal de Circuito al no interpretar el contrato vigente entre las partes en forma integral. En esencia, los demandados sostienen que el Reglamento al cual los miembros de la comunidad se obligaron, cuando aceptaron formar parte de la Iglesia, es un contrato válido en el cual específicamente se le requería a cada uno de sus miembros las aportaciones económicas que ahora cuestionan.

Los feligreses del Barrio Navarro, por su parte, argumentan que aquí estamos frente a un contrato que atenta contra la ley, la moral y el orden público. Fundamentan su argumentación en la disposición constitucional que prohibe que a una persona se le prive de su propiedad sin justa compensación y sin el debido proceso de ley y que el validar este contrato provocaría un enriquecimiento injusto por parte de la Iglesia. Veamos.

Los contratos son negocios jurídicos bilaterales y, en nuestro ordenamiento, constituyen una de las varias formas en que las personas pueden obligarse entre sí. Santiago v. A.C.A.A., 119 D.P.R. 711 (1987). Un contrato nace desde el mismo instante en que dos personas consienten a obligarse, según se dispone en el Artículo 1206 del Código Civil, 31 L.P.R.A. 3371.[6] Cuando se perfecciona el acuerdo, las personas consienten cumplir, no sólo con lo expresamente

_____

[6] "El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio." Art. 1206.

pactado, sino también con todo aquello que sea conforme a la buena fe, el uso y la ley. Colondres v. Bayrón, 114 D.P.R. 833 (1983).

La libertad para contratar es la base de esta fuente de obligación en Puerto Rico. El Artículo 1270 de nuestro Código Civil, 31 L.P.R.A. 3372, dispone que "los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre y cuando no sean contrarios a las leyes, la moral ni al orden público."

Además, hemos reconocido que, la constitución y reglamentos de una organización son el contrato que regula la relación entre dicha entidad y sus miembros y que, por ello, dicha relación es una de naturaleza contractual. Logia v. Logia, 72 D.P.R. 488, (1951).

Somos del criterio --en este respecto, al igual que el foro de instancia y el Tribunal de Circuito-- que el Reglamento que rige a la Iglesia, y al que se obligaron los feligreses demandantes, constituye la ley entre las partes, siempre y cuando, claro está, se cumpla con el precepto básico de que el mismo no atente contra la ley, la moral y el orden público.[7]

---

[7] La determinación a esos efectos, naturalmente, no podrá girar sobre cláusulas de dicho Reglamento que envuelvan consideraciones relacionadas con la fe, dogma o creencias religiosas de las partes. Díaz v. Colegio Nuestra Señora del Pilar, ante.

El primero de dichos Reglamentos ––el cual entró en vigor el 15 de noviembre de 1970–– establece, en la Sección 89 del Artículo XIX del mismo, que:

> "Todo donativo hecho a esta Iglesia, no importa su naturaleza pasará a ser propiedad de ella y no será devuelto a ninguno de sus miembros o amigos donantes puesto que se reciben los donativos con la condición indicada. [...]" (Enfasis suplido.)

Es de notar que los dos (2) Reglamentos posteriores ––esto es, el que entró en vigor el 28 de marzo de 1981 y el del 1$^{ro.}$ de enero de 1990–– contienen disposiciones similares.[8] Resulta obvio que estas disposiciones ––en las cuales no están envueltas consideraciones relacionadas con la fe, dogma o creencias religiosas de las partes–– no violan, prima facie, ni la ley, la moral ni el orden público. Claro está, un feligrés podía, y puede, hacer a la Iglesia un donativo de bien mueble o inmueble. Dicho donativo naturalmente, tiene que ser hecho en forma cónsona con lo dispuesto por nuestro ordenamiento jurídico al respecto. Ello nos lleva a las disposiciones de los Artículos 574 y 575 del Código Civil de Puerto Rico, 31 L.P.R.A. secciones 2009 y 2010.

El primero de ellos, esto es, el Artículo 574 establece que:

> "La donación de cosa mueble podrá hacerse verbalmente o por escrito.
>
> La verbal requiere la entrega simultánea de la cosa donada. Faltando este requisito, no

---

[8] Véase: Sección 103 del Artículo 22, Parte VI del Reglamento de 1981 y la Sección 192, Artículo 2, Parte VIII del Reglamento de 1990.

surtirá efecto si no se hace por escrito y consta en la misma forma la aceptación." (Énfasis suplido.)

Por su parte, el citado Artículo 575 señala que:

"Para que sea válida la donación de cosa inmueble ha de hacerse en escritura pública, expresándose en ella individualmente los bienes donados y el valor de los cargas que deba satisfacer el donatario.

La aceptación podrá hacerse en la misma escritura de donación o en otra separada; pero no surtirá efecto si no se hiciere en vida del donante.

Hecho en escritura separada, deberá notificarse la aceptación en forma auténtica al donante, y su anotará esta diligencia en ambas escrituras."

Como podemos notar, existe una gran diferencia en el trato jurídico que le da el Código a la donación de un bien mueble y la donación de un bien inmueble. Como surge de la relación de hechos que hiciéramos al comienzo, tanto el tribunal de instancia como el Tribunal de Circuito de Apelaciones entendieron que nos enfrentamos a una donación de un bien inmueble, ello tanto en relación a los dos solares como a la edificación del templo. Es por ello que dichos foros judiciales determinaron que, al no cumplirse con los requisitos que establece el Código Civil respecto a las donaciones de bienes inmuebles, las donaciones realizadas por los feligreses a la Iglesia eran inoperantes; razón por la cual resolvieron, en cuanto a los dos solares, que existía una comunidad de bienes entre la Iglesia y los feligreses, los cuales tenían derecho a una participación proporcional conforme a lo aportado por cada uno de ellos. Por otro lado,

y en cuanto al templo propiamente, los referidos foros judiciales determinaron que el mismo le pertenecía a los feligreses en su totalidad por razón de que dicha edificación había sido construida con dinero de éstos. <u>Erraron al así resolver</u>.


                              III

Establece el Artículo 577 del Código Civil, 31 L.P.R.A. sec. 2001, que:

> "Podrán hacer donación todos los que puedan contratar y disponer de sus bienes".

Dicho de otra manera, y en lo pertinente al caso que nos ocupa, nadie puede donar un bien que no le pertenece. Procede, entonces, que nos cuestionemos si los feligreses del Barrio Navarro de Gurabo, Puerto Rico, podían donarle a la Iglesia Universal de Jesucristo los dos solares que se compraron y el templo que se edificó. La contestación en la negativa parece ser inescapable ya que éstos nunca fueron dueños de dichos bienes inmuebles.

Los feligreses del Barrio Navarro lo que le donaron a la Iglesia Universal de Jesucristo fue una suma de dinero, recolectada la misma día a día y semana a semana, con el propósito de que la Iglesia pudiera adquirir los bienes inmuebles. En otras palabras, lo que dichos feligreses le donaron a la Iglesia fue un bien mueble. La referida donación de dinero, conforme establece el antes citado Artículo 574 del Código Civil, es totalmente válida aun cuando la misma se

haga verbalmente, únicamente requiriendo el Código en dicha alternativa el hecho de que la entrega de la cosa donada sea simultánea.

En el presente caso nos enfrentamos, no hay duda, a la donación de un bien mueble de forma verbal donde la entrega de la ofrenda en dinero fue simultánea a la misma. Siendo ello así, las donaciones monetarias efectuadas ——tanto en los casos de la compra de los dos solares como en el de la edificación del templo—— son completamente válidas ya que lo que se donó, por los feligreses, fue el dinero para comprar dichos solares y construir el edificio. La Iglesia por medio de su representante en la comunidad ——esto es, el pastor[9]—— aceptó dicho donativo, lo cual validó la donación realizada.[10]

---

[9] Conforme los tres Reglamentos que, en distintas épocas han regido los destinos de la Iglesia Universal de Jesucristo, el pastor es la persona "que tiene a cargo una congregación por mandato de Dios y de la Junta de Directores" de la referida Iglesia.

[10] La decisión que hoy emitimos encuentra apoyo en lo resuelto en Logia v. Logia, ante. Allí adoptamos la doctrina, de que cuando dos grupos rivales alegan ser dueños de un mismo bien, las cortes, de ordinario, deben conceder los bienes a aquel grupo que ha funcionado dentro de la estructura prescrita por la constitución y reglamentos de la organización y que constituyen el contrato que gobierna la misma.
    Esta doctrina es una ampliamente reconocida en las distintas jurisdicciones estatales de los Estados Unidos. Véase, a esos efectos: Fuchs v. Meisel, 60 N.W. 773 (1894); Michigan Congregational Conference v. United Church of Station, 48 N.W. 2d.108 (1951); Tea v. Protestant Episcopal Church, 610 P.2d. 181 (1980), Diviese of Newark v. Burns, 417 A.2d. 31 (1980); Protestant Episcopal Church v. Graves, 417 A.2d 19 (1980); Bennison v. Sharp, 329 N.W.2d. 466 (1982).

Por los fundamentos expuestos, procede decretar la revocación de la sentencia emitida en el presente caso por el Tribunal de Circuito de Apelaciones, la cual confirmó la emitida por la Sala Superior de Caguas del Tribunal de

---

En <u>Michigan Congregational Conference</u>, ante, la Corte Supremo del Estado de Michigan expresó:

> "...while members of a church undoubtedly possess the legal right to withdraw from it, with or with them, for their own purposes, or transfer to any other religious body, property previously without reason, they may not, in so doing, take conveyed, to, or dedicated to the use of, the religious denomination from which they are withdrawing or one of its member churches, but such property must remain for the use and benefit of adherents to that denomination or those who represent it."

Una determinación contraria a la conclusión a la que hoy llegamos, <u>aparte del hecho de ser incorrecta desde un punto de vista jurídico</u>, causaría a nuestro juicio un disloque en nuestra sociedad.

Resolver, como lo hace el foro de instancia y el Tribunal de Circuito, en el sentido de que los feligreses demandantes tienen derecho a participar junto con la Iglesia en una comunidad de bienes sobre las propiedades que disfrutaron mientras fueron miembros de la Iglesia Universal de Jesucristo, plantearía, entre otras, las siguientes interrogantes:

1. Los feligreses no pueden ser identificados con absoluta certeza; ello en vista del hecho que es prácticamente imposible identificar a las personas que cada día se reunieron en cada uno de Los servicios religiosos.

2. Su participación en la comunidad de bienes no podría ser determinada con precisión; esto es así debido a que estaríamos obligando a los tribunales a tener que tomar determinaciones en cuanto a la cantidad de dinero que ofreció cada feligrés en cada uno de los servicios, tomando también en cuenta a cualquier otra persona que, habiendo acudido a dicho templo en alguna ocasión, reclame haber hecho alguna donación que lo haga parte de la comunidad de bienes de la feligresía.

3. Cualesquiera de los miembros de la feligresía podría, en cualquier momento, solicitar la disolución de la comunidad de bienes, ello en vista de lo dispuesto por el Artículo 334 del Código Civil, 31 L.P.R.A. sec. 1279.

Primera Instancia; devolviéndose el caso al foro de instancia para procedimientos ulteriores consistentes con lo aquí resuelto.

Se dictará Sentencia de conformidad.



                        FRANCISCO REBOLLO LOPEZ
                            Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Víctor L. Amador Parrilla

Demandante-recurrido

v.                                    CC-97-775        CERTIORARI

**Concilio Iglesia Universal
de Jesucristo**

Demandado-recurrente


**SENTENCIA**


**San Juan, Puerto Rico, a 23 de marzo de 2000**


**Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida en el presente caso por el Tribunal de Circuito de Apelaciones, Circuito Regional V, la cual confirmó la emitida por la Sala Superior de Caguas del Tribunal de Primera Instancia; devolviéndose el caso al foro de instancia para procedimientos ulteriores consistentes con lo aquí resuelto.**

**Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.**


**Isabel Llompart Zeno
Secretaria del Tribunal Supremo**