Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| COMPAÑÍA DE TURISMO DE PUERTO RICO<br><br>**Apelado**<br><br>V.<br><br>*HORNED DORSET PRIMAVERA, INC.; HAROLD L. DAVIES WILHELM SACK*<br><br>**Apelante** | KLAN202400889 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Aguada<br><br>Civil. Núm. RN2019CV00064<br><br>Sobre: Cobro de Impuesto sobre el Canon de Ocupación de Habitación |
| --- | --- | --- |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

**Hernández Sánchez, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 5 de diciembre de 2024.

El 3 de octubre de 2024, The Horned Dorset Primavera, Inc. (Horned), el Sr. Harold L. Davies (señor Davies) y el Sr. Wilhelm Sack (señor Sack) (en conjunto, los apelantes) comparecieron ante nos mediante *Apelación* y solicitaron la revisión de una *Sentencia Sumaria* que se dictó el 12 de agosto de 2024 y se notificó el 19 de agosto de 2024 por el Tribunal de Primera Instancia, Sala Superior de Aguada (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* que presentó la Compañía de Turismo de Puerto Rico (CTPR o apelada) el 2 de octubre de 2023. En consecuencia, condenó a Horned al pago de la cantidad de $197,782.15 más el interés anual. Además, condenó a los apelantes a pagar solidariamente la suma de $1,544,435,69 más recargos e intereses.

Por los fundamentos que expondremos a continuación, **confirmamos** el dictamen recurrido.

Número Identificador

RES2024 _____

I.

El 30 de septiembre de 2019, la CTPR presentó una *Demanda Jurada* sobre cobro de impuesto sobre el canon por ocupación de habitación en contra de los apelantes.[1] Alegó que Horned era la propietaria y administradora del hotel Horned Dorset Primavera (el hotel) y que la operación de este estaba a cargo de Horned, y sus accionistas y oficiales, a saber, el señor Davies y el señor Sack. Sostuvo que el hotel se encontraba registrado como hostelero ante la División de Impuestos de la CTPR desde el año 2004. Así pues, indicó que según surgía de la Certificación de Deuda que expidió la División de Impuestos a Hospederías de la CTPR el 13 de septiembre de 2019, los apelantes tenían una deuda por concepto de impuestos sobre el canon por ocupación de habitación con relación a la operación del hotel que ascendía a $1,481,095.45.

Explicó que, el 1 de marzo de 2004, Horned, representado por el señor Davies, suscribió un "Acuerdo Final" al amparo del Código de Rentas Internas de 1994 con el Departamento de Hacienda y la compañía, Pequeños Grandes Hoteles, Inc., también representada por el señor Davies. Expresó que, mediante este acuerdo, Horned reconoció que tenía deudas por concepto de contribuciones retenidas sobre cánones de ocupación durante los años 1999 al 2003. Además, plantearon que, en este acuerdo, Horned se comprometió a realizar unos pagos por un plazo pactado para satisfacer la deuda. Adujo que Horned cumplió con ciertos pagos, pero que luego dejó de realizarlos por lo que incumplió con el acuerdo. Manifestó que a raíz del incumplimiento realizaron numerosas gestiones de cobro extrajudiciales y judiciales, pero que estas fueron infructuosas.

---

[1] Véase, págs. 1-14 del apéndice del recurso.

Esbozó que posteriormente, el 25 de septiembre de 2013, le enviaron a Horned un correo certificado de una notificación de deuda y/o deficiencia indicándole que adeudaba una cantidad por concepto de impuestos sobre el canon de ocupación de habitación para el año 2003 al 2013 y concediéndole un término para realizar el pago adeudado. De igual forma, indicó que se le concedió la opción de acogerse a un plan de pago o de no estar de acuerdo con la cantidad adeudada, que solicitara una vista administrativa. Afirmó que Horned no realizó ningún esfuerzo para cumplir con el pago de la deuda por lo que presentaron una demanda el 3 de febrero de 2014 reclamando la cantidad adeudada por el periodo de 1999 al 2013.

Por otro lado, sostuvo que, el 22 de mayo de 2015, Horned se acogió al Capítulo 11 del Código de Quiebras y ello tuvo el efecto de paralizar la causa de acción presentada el 3 de febrero de 2014. Ante ello, puntualizó que comparecieron al Tribunal de Quiebras y presentaron su reclamación contra Horned por la cantidad total de $1,208,489.47 que incluían las deficiencias en el pago de impuestos sobre el canon de la ocupación de habitación desde el año 2004 al 2015 así como los intereses y recargos acumulados. Puntualizó que Horned impugnó el pago, pero que el Tribunal de Quiebras rechazó la impugnación y resolvió que la totalidad de la deuda reclamada por la CTPR era válida y debía pagarse bajo el plan de reorganización a ser aprobado por el Tribunal de Quiebras. Sin embargo, indicó que posteriormente la solicitud de quiebra fue desestimada y el caso de quiebra se cerró.

Insistió que, a pesar de las gestiones de cobro realizadas, Horned había demostrado un total desinterés en cumplir con su obligación de remitir los impuestos cobrados sobre el canon por ocupación de habitación. Así pues, le solicitó al TPI a que condenara a los apelantes al pago de $864,650.57 en principal, más

$518,219.88 en intereses y $98,153.00 en recargos, así como las costas y gastos y cualquier otra cantidad acumulada. Asimismo, le solicitó al TPI a que emitiera una orden y mandamiento de embargo provisional y prohibición de enajenar y disposición de bienes sobre todos los activos, cuentas bancarias y/o bienes muebles de Horned para acumular una suma suficiente para cubrir la deuda consolidada de $1,481,095.45 más los intereses legales que se acumularan y las costas, gastos y honorarios de abogado.

Posteriormente, el 7 de marzo de 2022, la apelada presentó una *Demanda Enmendada* con el único fin de añadir una causa de acción para descorrer el velo corporativo de Horned.[2] Así las cosas, el 25 de abril de 2022, Horned presentó su alegación responsiva mediante la cual negó la mayoría de las alegaciones en su contra y presentó sus respectivas defensas afirmativas.[3] Por su parte, el 27 de abril de 2022, el señor Davies presentó su contestación a la demanda enmendada, mientras el señor Sack presentó la suya el 28 de abril de 2022.[4] En ambas contestaciones, se negaron la mayoría de las alegaciones contenidas en la demanda enmendada.

Luego de varios trámites procesales que no son pertinentes discutir, el 2 de octubre de 2023, la apelada presentó una *Moción de Sentencia Sumaria.*[5] En primer lugar, expuso cuarenta y cuatro (44) hechos que, a su juicio no estaban en controversia. Luego explicó que, previo a que entrara en vigor la Ley Núm. 272-2003, según enmendada, mejor conocida como *Ley del Impuesto sobre el Canon por Ocupación de Habitación del Estado Libre Asociado de Puerto Rico*, 13 LPRA sec. 2271, *et seq.* (Ley Núm. 272-2003) el Departamento de Hacienda regía la regulación de los impuestos

---

[2] *Véase*, Entrada Núm. 130 SUMAC.
[3] *Véase*, Entrada Núm. 134 de SUMAC.
[4] *Véase*, Entradas Núm. 135 y 136 de SUMAC.
[5] Véase, págs. 146-390 del apéndice del recurso.

sobre el canon por ocupación de habitación. Sin embargo, indicó que al surtir efecto la Ley Núm. 272-2003, *supra*, conllevó a que las cuentas por cobrar por concepto de los impuestos sobre el canon por ocupación de habitación fueran transferidas a la CTPR en su totalidad.

En vista de ello, indicó que, el "Acuerdo Final" disponía que, a partir del 1 de abril de 2004, los pagos por concepto del canon de ocupación de habitación se efectuarían directamente a la CTPR. Puntualizó que, debido a que Horned fue parte suscribiente en el "Acuerdo Final" y en este reconoció las deudas tasadas con el Departamento de Hacienda por concepto de contribuciones retenidas sobre cánones de ocupación de habitación entre los años 2003 al 2009, esta última estaba obligaba a pagarle a la CTPR la cantidad de $197,782.15 más el interés según pactado. Indicó que, dicha deuda estaba vencida y era líquida y exigible.

Asimismo, sostuvo que, al momento de la presentación del presente escrito, Horned tenía una deuda que estaba vencida y era líquida y exigible por concepto de impuestos sobre el canon por ocupación de habitación que ascendía a $1,544,435.69. Resaltó que esta deuda no se pagó a pesar de que se le concedió un término a Horned para pagarla, se le ofreció un plan de pago y se le apercibió de las consecuencias de no remitir el impuesto cobrado. Por los motivos antes expuestos, solicitó al TPI que resuelva el pleito por la vía sumaria y que le impongan honorarios de abogado a la parte apelante por incurrir en temeridad.

Por su parte, el 25 de octubre de 2023, Horned presentó su *Oposición de los Demandados a Moción de Sentencia Sumaria de la Compañía de Turismo y Solicitud de Sentencia Sumaria a favor de Horned Dorset, Sack y Davies*.[6] En dicho escrito formuló los hechos

---

[6] Véase, págs. 391-459 del apéndice del recurso.

que, a su juicio, no estaban en controversia. Posteriormente alegó que, según un acuerdo transaccional que suscribió con una compañía llamada Lifeafar, intitulado *Release Agreement*, se relevó de su obligación con CTPR. Particularmente señaló que, la CTPR llevo a cabo una negociación con Lifeafar mediante la cual propuso transar la deuda acumulada de Horned por concepto de impuestos por la cifra de $432,325. No obstante, sostuvo que luego de tomar en cuenta varios factores traídos a su atención por Lifeafar, la CTPR accedió a una cifra transaccional de $382,880, y como resultado, se ssucribió el *Release Agreement*.

Por otro lado, puntualizó que, en virtud de este acuerdo, Lifeafar se obligó a pagar la cuantía transaccional antes mencionada independientemente de cómo resultara el negoció entre Lifeafar y Horned para el traspaso de la operación hotelera. A tales efectos, afirmó que dicho acuerdo constituyó una novación extintiva por sustitución de deudor. Además, argumentó que interpretar que el relevo obligacional estaba sujeto a condiciones suspensivas, tal como lo argumentó la CTPR para invocar la cláusula cuarta del contrato,[7] las mismas serían nulas por depender en la exclusiva voluntad del deudor. Ante ello, solicitó al TPI que dictara sentencia sumaria desestimando la demanda en todas sus partes.

Evaluadas las mociones presentadas por las partes, el 12 de agosto de 2024 y notificada el 19 de agosto de 2024, el TPI dictó *Sentencia Sumaria.*[8] En dicho dictamen, luego de esbozar el derecho aplicable, expresó lo siguiente:

> En primer lugar, no existe controversia en que, el 28 de marzo de 2020, la Compañía, Lifeafar y Horned Dorset Primavera Inc. suscribieron un acuerdo titulado Release Agreement, mediante el cual pactaron que, a

---

[7] La cláusula cuatro del acuerdo dispone lo siguiente: Until such time that PRTC receives the Payment in full, PRTC will continue to pursue the collection action pending against Horned Dorset and its principals, before the Puerto Rico Court of First Instance in Aguada, Civil No. RN2019CV00064 (herein, the "Civil Action"). Upon receipt of the Payment in full, PRTC will seek voluntary dismissal with prejudice of all claims asserted in the Civil Action.

[8] Id., págs. 461-473.

cambio del pago reducido de $382,880.00 por parte de Lifeafar, la Compañía relevaría a la parte demandada de toda reclamación relacionada a la deuda de $1,481,095.45, por concepto de impuestos por ocupación de habitación hotelera. El pago se realizaría en 3 plazos, de los cuales 2 serían por la cantidad de $76,576.00 y se depositarían en una cuenta creada para beneficio de la Compañía al momento de la ejecución del Release Agreement y 30 días después de la ejecución. El último pago sería por la cantidad de $229,728.00, mediante cheque de gerente o transferencia electrónica a la Compañía, en o antes del 15 de abril de 2020, fecha para la cual debía cerrarse la transacción de compraventa de los activos de Horned Dorset Primavera Inc. por parte de Lifeafar. Según surge del Release Agreement, una vez se realizaran los 3 pagos y se liberaran los fondos a favor de la Compañía, esta relevaría a la parte demandada de cualquier reclamación relacionada a los impuestos por habitación atrasados, así como de cualquier acuerdo relacionado. Del Realese (sic) Agreement surge, además, que hasta tanto no se recibiera el pago en su totalidad, la Compañía continuaría con la acción de cobro pendiente en contra de la parte demandada en el caso de epígrafe. En adición, según se desprende del Realese (sic) Agreement, la aceptación del pago por la Compañía y la garantía del relevo estaban condicionadas a que ni Horned Dorset Primavera Inc., ni sus directores o funcionarios participarían de cualquier manera en la operación del hotel. Ahora bien, Lifeafar realizó los primero 2 pagos por la cantidad de $76,576.00, sumando así la cantidad de $153,152.00. Sin embargo, Lifeafar no realizó el pago final por la cantidad de $229,728.00 ni cerró la compra de activos de Horned Dorset Primavera Inc.

Ante esto, el TPI determinó que no procedía dictar sentencia sumaria a favor de la parte apelante, en vista de que el relevo de la deuda de Horned, según el *Release Agreement*, solo surtía efecto cuando se realizara el pago total y el cierre de la compraventa de los activos de Horned. Puntualizó que, de no cumplirse estas condiciones, la CTPR continuaría su reclamación en contra de la parte apelante en el caso de autos. En este sentido, el TPI indicó que, a diferencia de lo argumentado por la parte apelante, el cumplimiento de las condiciones no dependía en la exclusiva voluntad de la parte deudora. Ello debido a que la obligación de la

apelada estaba sujeta a la voluntad de una tercera persona, a saber, Lifeafar, y a un suceso futuro e incierto.[9]

Así pues, declaró Ha Lugar la moción de sentencia sumaria presentada por la parte apelada. En consecuencia, condenó a Horned al pago de $197,782.15 más el interés anual. Además, condenó a los apelantes a pagar solidariamente el monto de $1,544,435.69, más recargos e interés. Inconforme, el 29 de agosto de 2024, la parte apelante presentó su *Solicitud de Reconsideración*, la cual fue declarada No Ha Lugar por el TPI mediante una *Resolución* que se dictó y notificó el 20 de septiembre de 2024.[10]

Aún inconforme, el 3 de octubre de 2024, los apelantes presentaron el recurso de epígrafe y formularon los siguientes señalamientos de error:

> **Cometió un manifiesto error de hecho el TPI al resolver que el Release Agreement que negociaron Lifeafar y la Compañía de Turismo sin participación alguna de Horned Dorset, constituyó un contrato de transacción entre Horned Dorset y la PRTC que contienen cláusulas suspensivas que obligaran a Horned Dorset a pesar de que esta nunca ni las negoció ni las conoció ni se sometió a las mismas inteligentemente.**

> **Cometió error de derecho el TPI al resolver por la vía sumaria una controversia que gira en torno a los actos coetáneos y posteriores al contrato, atenientes a la intención de las partes.**

Atendido el recurso, el 7 de octubre de 2024, emitimos una *Resolución* concediéndole a la parte apelada hasta el 6 de noviembre de 2024 para presentar su alegato en oposición. Oportunamente, la CTPR presentó su *Alegato de la Parte Apelada* y negó que el TPI cometiera los errores que los apelantes le imputaron. Con el

---

[9] El TPI señala que, de haberse cumplido con las condiciones del acuerdo, la parte deudora u obligada sería la CTPR. Por esta razón, el cumplimiento de la condición no estaba bajo la exclusiva voluntad de la parte deudora (CTPR), sino dependía sobre un tercero (Lifeafar) que realizara el pago total acordado y cerrara la compraventa de los activos de la operación hotelera dentro de la fecha designada (sucesos futuros e inciertos).

[10] *Véase,* Entrada Núm. 165 y 167 de SUMAC.

beneficio de la comparecencia de ambas partes procedemos a resolver el asunto ante nos. *Veamos.*

II.

-A-

En esencia, el principio rector de las Reglas de Procedimiento Civil es proveerles a las partes envueltas en un pleito legal, una solución justa, rápida y económica en todo procedimiento. Regla 1 de Procedimiento Civil, 32 LPRA Ap. V, R.1. El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, hace viable este objetivo en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita.

Conforme a la Regla 36.3 (e) de Procedimiento Civil, *supra,* se dictará sentencia sumaria "si las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y, además, si el derecho aplicable así lo justifica". A estos efectos, el foro judicial tiene la potestad para disponer de asuntos pendientes sin la necesidad de celebrar un juicio, esto debido a que lo que restaría sería aplicar el derecho a los hechos no controvertidos. *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012).

Es menester destacar que, solo procede dictar sentencia sumaria cuando surge claramente que el promovido no puede prevalecer y que el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.,* supra, pág. 299. Por lo tanto, no procede dictar sentencia sumaria cuando no existe una clara certeza sobre todos los hechos materiales en la controversia. Íd. Aun así, "[c]ualquier

duda no es suficiente para derrotar una moción de sentencia sumaria. Tiene que ser una duda que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Ramos Pérez v. Univisión*, 178 DPR 200, 214 (2010).

En reiteradas ocasiones, el Tribunal Supremo ha establecido que se considera como un hecho esencial y pertinente, aquel que "puede afectar el resultado de la reclamación acorde con el derecho sustantivo aplicable". Íd., pág. 213. Dicho esto, para que proceda una moción de sentencia sumaria no tan solo se requiere que haya una inexistencia de hechos en controversia, sino que también la sentencia que dicte el foro judicial tiene que proceder conforme al derecho sustantivo aplicable.

En particular, la Regla 36.2 de Procedimiento Civil, *supra,* permite que cualquier parte presente una moción, basada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación. Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". *Municipio de Añasco v. ASES et al.,* 188 DPR 307, 310 (2013).

Por su parte, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 677 (2018). Por el contrario, esa persona viene obligada a enfrentar la moción de su adversatario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. *SLG Zapata- Rivera v.*

*J.F. Montalvo,* 189 DPR 414, 432 (2013). Específicamente, la Regla 36.3 de Procedimiento Civil, *supra,* expone los criterios que debe cumplir la parte que se opone a la moción de sentencia sumaria.

Al amparo de dicha regla, la oposición a la solicitud de sentencia sumaria el promovido debe, como parte de su carga desglosar los hechos sobre los que aduce que no existe controversia, y, además para cada uno de ellos debe especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya. Asimismo, cabe destacar que, la Regla 36.5 de Procedimiento Civil*, supra,* establece que las declaraciones juradas para sostener u oponerse a una moción de sentencia sumaria que contienen solo conclusiones, sin hechos específicos que las apoyen, no tienen valor probatorio, por lo que son insuficientes para demostrar la existencia de lo que allí se concluye.

Según dispone el caso de *Mejías et al. v. Carrasquillo et al.,* supra, pág. 300 citando a: *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 280-281 (1990), "al evaluar una moción de sentencia sumaria, los jueces no están limitados por los hechos o documentos que se aduzcan en la solicitud, sino que deben considerar todos los documentos en autos, sean o no parte de la solicitud de sentencia sumaria de los cuales surjan admisiones hechas por las partes".

En síntesis, no procede dictar sentencia sumaria cuando: (1) existen hechos materiales y esenciales en controversia; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción de sentencia sumaria una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra,* 186 DPR 713, 757 (2012); *Ramos Pérez v. Univisión, supra*, pág. 217. Además, no se debe adjudicar un caso sumariamente cuando existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o

cuando el factor credibilidad es esencial y está en disputa. Íd. pág. 219.

Ahora bien, según *Verá v. Dr. Bravo,* 161 DPR 308, 334-335 (2004) este Foro Apelativo utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una sentencia sumaria. Sin embargo, el Tribunal Supremo especifica que, al revisar la determinación de primera instancia sólo podemos considerar los documentos que se presentaron ante el TPI. Íd. Lo anterior, debido a que "las partes no pueden añadir en apelación *exhibits,* deposiciones o affidávits que no fueron presentadas oportunamente en el foro de primera instancia, ni pueden esbozar teorías nuevas o esgrimir asuntos nuevos por primera vez ante el foro apelativo". Íd. Además, sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. Íd. Es decir, no podemos adjudicar los hechos materiales y esenciales en disputa, ya que esta tarea le corresponde al Tribunal de Primera Instancia. Íd.

Por otro lado, en *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015), el Tribunal Supremo estableció que al revisar una determinación del foro primario en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el Tribunal de Primera Instancia aplicó

correctamente el derecho. *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

**-B-**

Las obligaciones surgen de la ley, los contratos, cuasicontratos y de cualquier otra acción u omisión en la cual medie culpa o negligencia. Art. 1042 del Código Civil, 31 LPRA ant. sec. 2992.[11] Aquellas obligaciones derivadas de un contrato tendrán fuerza de ley para las partes, y deberán cumplirse según se hayan delimitado; *pacta sunt servanda.* Art. 1044 del Código Civil, 31 LPRA ant. sec. 2994. Los contratos son negocios jurídicos que existen desde que concurren los requisitos de consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 LPRA ant. sec. 3391. Una vez las partes consienten en obligarse a cumplir determinadas prestaciones, surge el contrato. Art. 1206 del Código Civil, 31 LPRA ant. sec. 3371; *Amador v. Conc. Igl. Univ. De Jesucristo*, 150 DPR 571, 581-582 (2000). En tal sentido, una vez perfeccionado el contrato, las partes se obligan no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza estén conformes con la buena fe, el uso y la ley. Art. 1210 del Código Civil, 31 LPRA ant. sec. 3375. Consecuentemente, los tribunales no podemos relevar a una parte de cumplir con el contrato cuando éste es legal y válido y no contiene vicio alguno. *Mercado, Quilichini v. U.C.P.R.*, 143 DPR 610, 627 (1997).

Ahora bien, en lo pertinente a la controversia ante nos, el Art. 1709 del Código Civil, 31 LPRA sec. ant. 4821, define el contrato de transacción como "un contrato por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había

---

[11] Resaltamos que el cuerpo legal vigente en el momento que las partes contrataron era el Código Civil del 1930.

comenzado".[12] Así pues, nuestro ordenamiento jurídico ha establecido que los elementos de un contrato de transacción son los siguientes: (1) la existencia de una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de eliminar o superar esa controversia; y (3) concesiones recíprocas. *Rodríguez v. Hospital et al.,* 186 DPR 889, 903 (2012).

Como en todo contrato, en los contratos de transacción deben concurrir los requisitos de consentimiento, objeto y causa. *Neca Mortg. Corp. v. A&W Dev. S.E.,* 137 DPR 860, 871 (1995). Sobre el consentimiento, existe ya que el acuerdo tiene que ser consensual; su objeto es la controversia entre las partes, pues sin ella no puede existir la transacción, y su causa consiste en la eliminación de la controversia mediante recíprocas concesiones. Íd. Asimismo, al interpretarlos, aplican las normas generales sobre la interpretación de los contratos siempre y cuando no sean incompatibles con una norma particular de interpretación. *Fonseca et al. v. Hosp. HIMA,* 184 DPR 281, 291 (2012). En primer lugar, si alguna cláusula contractual admite varias interpretaciones, deberá utilizarse la interpretación más adecuada para que el contrato produzca efecto. Art. 1236 del Código Civil, 31 LPRA sec. ant. 3474.

Además, aplican las normas sobre la necesidad de descubrir la verdadera intención de los contratantes cuando esta no surge claramente de los términos del contrato. *Fonseca et al. v. Hosp. HIMA, supra,* pág. 291; Art. 1233 del Código Civil, 31 LPRA sec. ant. 3471. Para conocer la intención de los contratantes es necesario considerar sus actos coetáneos y posteriores al otorgamiento del contrato. Íd. Ahora bien, si los términos de este son claros y no

---

[12] Sobre el particular, el Art. 1497 del Código Civil de 2020 establece que "[p]or el contrato de transacción, mediante concesiones recíprocas, las partes ponen fin a un litigio o a su incertidumbre sobre una relación jurídica".

dejan duda sobre la intención de las partes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil, *supra.*

**-C-**

La novación se puede llevar a cabo mediante la variación del objeto o condiciones principales de una obligación, sustituyendo la persona del deudor por otro, o la sustitución del antiguo acreedor por otro. Art. 1157 del Código Civil, 31 LPRA sec. ant. 3241. Ahora bien, la novación de una obligación puede ser modificativa o extintiva. *PDCM Assoc. v. Najul Bez,* 174 DPR 716, 725 (2008). En lo pertinente al caso ante nos, para que una obligación se considere como extinguida por otra, es necesario que así se establezca terminantemente o que ambas obligaciones sean totalmente incompatibles. Art. 1158 del Código Civil, 31 LPRA sec. ant. 3242. De manera que, es un elemento indispensable de la vertiente extintiva el *animus novandi,* es decir, la voluntad expresa de extinguir una obligación por otra. *PDCM Assoc. v. Najul Bez, supra,* pág. 726. Ello, ya que la novación "encierra un asunto de intención que debemos inferir de las circunstancias de cada caso y de la voluntad de las partes". Íd.

III.

En su primer señalamiento de error, la parte apelante argumentó que el TPI incidió al resolver que el *Release Agreement* que negoció Lifeafar y la CTPR constituyó un contrato de transacción entre Horned y la CTPR. Además, añadió que, el TPI erró al determinar que dicho contrato de transacción contenía cláusulas suspensivas que obligaban a Horned, a pesar de que ésta nunca las negoció, conoció o se sometió a ellas inteligentemente. Por otra parte, en su segundo señalamiento de error, sostuvo que el TPI erró al resolver por la vía sumaria una controversia que, según ellos, giraba en torno a los actos coetáneos y posteriores al contrato, atinentes a la intención de las partes.

Ahora bien, previo a discutir los señalamientos de error previamente reseñados, cabe precisar que, al momento de revisar la concesión de una sentencia sumaria, nos encontramos en la misma posición que el TPI. A tono con esta norma, debemos evaluar, en primer lugar, si al presentar la solicitud de sentencia sumaria y su oposición las partes cumplieron con los requisitos de forma establecidos en la Regla 36.3 de Procedimiento Civil, *supra,* y con los dispuestos en *SLG Zapata-Rivera v. J.F. Montalvo,* supra. Al evaluar los escritos presentados por las partes juzgamos que, en esencia, ambas cumplieron con los referidos requisitos. Resuelto lo anterior, nos corresponde entonces evaluar si existen hechos materiales en controversia que nos impidan dictar sentencia sumaria. Según surge de la solicitud presentada por la CTPR, esta determinó cuarenta y cuatro (44) hechos como incontrovertidos. Evaluados estos hechos señalados con la prueba documental y la oposición de la parte apelante, no encontramos hechos medulares controvertidos, por lo cual resta determinar la corrección de la aplicación del derecho.

Por estar estrechamente relacionado, discutiremos los errores señalados en conjunto. Los apelantes argumentaron que el TPI erró al determinar que se constituyó un contrato de transacción entre Horned y la CTPR. Alegaron que estos no formaron parte de los acuerdos y negociaciones que se llevaron a cabo entre Lifeafar y la parte apelada. Sostuvieron que el señor Sack firmó jubiloso el *Release Agreement* sin haber leído el mismo y descansó en las explicaciones generales del señor Eric Berman[13] sobre el contrato, en vista de que la transacción de este caso era importante para la operación hotelera. Además, citaron la cláusula 5 del *Release*

---

[13] Representante de Lifeafar.

*Agreement*[14] como prueba de la intención de excluir a Horned de la relación contractual. Asimismo, indicaron que cuando el representante legal de Horned solicitó al señor Berman copia del acuerdo, éste se negó alegando que se trataba de un acuerdo confidencial entre Lifeafar y la CTPR. Por último, señalaron que, para la fecha que finalmente recibieron copia del acuerdo, Lifeafar había efectuado el pago de los primeros dos plazos de los tres pactados, todo sin conocimiento de Horned. En virtud de lo antes expuesto, sostuvieron que se configuró una novación extintiva por cambio de deudor.

Según el derecho citado, para que una obligación quede extinta es necesario que se exprese patentemente o que la antigua y nueva obligación sean del todo incompatible. Art. 1158 del Código Civil, *supra.* Conforme a las cláusulas 2 y 4 del *Release Agreement,* el relevo de la obligación de Horned estaba sujeto a que Lifeafar emitiera el pago total del monto acordado y cerrara la compraventa de los activos de Horned, en o antes del 15 de abril de 2020.[15] Particularmente, la cláusula 4 del referido contrato estipula que la CTPR continuaría su reclamación en contra de los apelantes hasta recibir el pago completo. En el caso de autos no se cumplió con las condiciones pactadas en las citadas disposiciones. Lifeafar no emitió el último pago y tampoco se realizó el cierre de la compraventa de los activos de Horned.  Es decir, el relevo condicionado nunca surtió efecto, por lo cual la parte apelante no fue relevada de su obligación

---

[14] El párrafo se lee del siguiente modo: 5. PRTC will accept the Payment in satisfaction of all Overdue Room Taxes by Horned Dorset regardless of the manner in which Lifeafar and Horned Dorset decide to structure the transaction by which Lifeafar acquires Horned Dorset's assets. Provided, however, that Lifeafar warrants and represents that, upon acquisition of Horned Dorset's assets and its renovation of the Hotel, neither Horned Dorset, nor its current directors and officers, will participate in any way in the operation of the Hotel other than with respect to transition services to be provided to Lifeafar. It is expressly agreed that, acceptance of the Payment by PRTC and the releases granted by PRTC in Paragraph 6 of this Agreement, are premised and conditioned on the accuracy of Lifeafar's representations and warranties outlined above.

[15] Véase, págs. 37-38 del apéndice del recurso.

y la CTPR podía continuar su acción para colectar el monto que se le adeuda.

Por otro lado, tampoco nos convencen los argumentos de la parte apelante que aluden a un vicio en el consentimiento del señor Sack al momento de firmar el *Release Agreement*. Surge de una *Opinión y Orden* que emitió la Corte de Quiebra de Estados Unidos para el Distrito de Puerto Rico que obra el expediente ante nuestra consideración que el señor Sack testificó que trabajó como gerente general en Horned por veinte y dos (22) años, y previo a esto, trabajó por veinte (20) años en Bermuda, cinco (5) como asistente de gerente y quince (15) como gerente general en *Horizons and Cottages* un "*high-end family resort*".[16] Resulta claro que el señor Sack es un individuo experimentado en el ámbito de negocios y el hecho de no haber leído el acuerdo por estar "jubiloso" y descansar en las explicaciones generales del señor Berman es una negligencia imputable solo a él mismo.

En esta línea, el hecho de que Horned no haya negociado las disposiciones del acuerdo no implica que el relevo obligacional debe cobrar vigor. No cabe duda de que el señor Sack se obligó a lo pactado en el *Release Agreement* al firmarlo. El no haber leído el mismo o participado en las negociaciones no crean impedimentos para obligar contractualmente a los apelantes. Recordemos que las obligaciones derivadas de un contrato tendrán fuerza de ley para las partes, y deberán cumplirse según se hayan delimitada. Art. 1044 del Código Civil, *supra*. Además, una vez perfeccionado el contrato, las partes se obligan no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza estén conformes con la buena fe, el uso y la ley. Art. 120 del Código Civil, *supra*.

---

[16] *Opinion and Order of the United States Bankruptcy Court for the District of Puerto Rico, Testimony of Mr. Wilhelm* Sack. Véase, pág. 348 del apéndice del recurso.

A su vez, tampoco la cláusula 5 del *Release Agreement* tuvo la intención de excluir a Horned de la relación contractual. Este párrafo lo que dispone es que tras la adquisición de los activos de Horned por parte de Lifeafar, ni Horned, ni sus directores u oficiales participaran en la operación del hotel con la excepción de los servicios de transición.

Por último, los apelantes argumentaron que al TPI determinar que el *Release Agreement* constituyó un contrato de transacción entre Horned y la CTPR ignoró la razón por la cual Lifeafar se acercó a la parte apelada para negociar el pago de la deuda por concepto de impuesto sobre ocupación de Horned. En este sentido, alegaron que Horned y Lifeafar habían acordado un *Exclusive Right to Purchase Agreement*.[17] Explicaron que en virtud de este acuerdo fue que Lifeafar se obligó a negociar con los acreedores de Horned y llevó a cabo actos de dominio sobre la operación hotelera en base de las obligaciones generadas por dicho contrato. Argumentan que fue en el contexto de las obligaciones que contrajo en el contrato de compraventa y sus propios actos coetáneos y posteriores que Lifeafar se acercó a la CTPR y negoció el *Release Agreement*. A tal efecto, concluyeron que la parte obligada en el *Release Agreement* lo era Lifeafar y no los apelantes.

Es preciso señalar que el *Exclusive Right to Purchase Agreement* fue acordado y firmado exclusivamente por Horned y Lifeafar. Lo negociado, las intenciones o los actos por conducto de lo pactado en dicho acuerdo son ajenos a la CTPR y su respectiva reclamación. De modo que, las razones por las cuales Lifeafar se acercó a la CTPR o las obligaciones contraídas por Lifeafar en virtud del *Exclusive Right to Purchase Agreement* son impertinentes para el

---

[17] Véase, págs. 22-34 del apéndice del recurso.

caso que nos ocupa. Por todo lo cual, el TPI no cometió los errores señalados por la parte apelante.

IV.

Por los fundamentos antes expuestos, **confirmamos** el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones