Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| LONGBRIDGE FINANCIAL, LLC.<br><br>**Apelado**<br><br>V.<br><br>LA SUCESIÓN DE MILAGROS SILVA RIVERA T/C/C MILAGROS SILVARIVERA T/C/C MILAGROS SILVA T/C/C MILAGRO SILVA RIVERA T/C/C MILAGRO SILVA compuesta por MILAGROS MELÉNDEZ SILVA, RAFAEL MELÉNDEZ SILVA, JOSE MELÉNDEZ SILVA; FULANO DE TAL COMO POSIBLES HEREDEROS DESCONOCIDOS CON INTERÉS EN LA SUCESIÓN; ESTADOS UNIDOS DE AMÉRICA; CENTRO DE RECAUDACIÓN DE INGRESOS MUNICIPALES (CRIM)<br><br>**Apelantes** | TA2026AP00043 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Civil. Núm. PO2022CV01489<br><br>Sobre: Ejecución de Hipoteca: Propiedad Residencial |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

**Hernández Sánchez, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 12 de febrero de 2026.

El 12 de enero de 2026, la sucesión de la Sra. Milagros Silva Rivera compuesta por el Sr. Rafael Meléndez Silva, el Sr. José Meléndez Silva y la Sra. Milagros Meléndez Silva (en conjunto, la sucesión Silva o los apelantes) comparecieron ante nos mediante un *Recurso de Apelación* y solicitaron la revisión de una *Sentencia* que se emitió el 2 de diciembre de 2025 y se notificó el 8 de diciembre de

2025, por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar una *Moción de Sentencia Sumaria* que presentó Longbridge Financial LLC. (LF o apelado). En consecuencia, ordenó la venta en pública subasta del inmueble hipotecado, para satisfacer las sumas adeudadas por los apelantes.

Por los fundamentos que expondremos a continuación, ***confirmamos*** la sentencia apelada.

I.

El 8 de junio de 2022, Reverse Mortgage Funding, LLC (RMF) presentó una *Demanda* sobre ejecución de hipoteca por la vía ordinaria contra la sucesión de Milagros Silva Rivera compuesta por Fulano de Tal y Fulana de Tal como posibles herederos desconocidos con interés en la sucesión[1], Estados Unidos de América, y el CRIM. Alegó que, era tenedora de buena fe de un préstamo hipotecario que The Money House, Inc. le otorgó a la señora Silva el 14 de diciembre de 2014. Sostuvo que dicho préstamo se garantizó mediante una hipoteca revertida sobre una propiedad ubicada en el municipio de Ponce por la suma principal de $177,000.00. Además, indicó que mediante el mencionado negocio se estableció el pago de una suma equivalente al diez por ciento (10.00%) del principal original, para costas, gastos y honorarios de abogado en caso de reclamación por la vía judicial.

Expresó que, la totalidad de la deuda estaba vencida a tenor con las cláusulas del convenio pactado ya que la señora Silva había fallecido y, además, ésta última había incurrido en incumplimiento

---

[1] En la Demanda, RMF comienza expresando que la Sra. Milagros Silva Rivera (señora Silva o la causante), falleció en o alrededor del 2 de octubre de 2020; y por desconocer la identidad de los herederos, incluyó a Fulano de Tal y Fulana de Tal como posibles herederos desconocidos con interés en la sucesión de la señora Silva. No obstante, luego aclaró que no tenía una reclamación personal en contra de los herederos de la sucesión. Sostuvo que solo les incluyó para notificarle sobre la acción *in rem* en contra del inmueble, debido a que estos tenían un interés propietario como miembros de la sucesión y para que ejercieran su derecho de retener o disponer de la propiedad bajo las guías establecidas del Departamento de la Vivienda y Desarrollo Urbano de Estados Unidos (conocido como, HUD).

con los términos y condiciones de la hipoteca por dejar de mantener la propiedad asegurada. Afirmó que, por esta razón, procedía acelerar la deuda. Por lo cual sostuvo que, al 31 de mayo de 2022, la sucesión de la señora Silva les adeudaba la suma principal de $142,469.31, más los intereses sobre tal suma correspondientes a $21,645.84, los cuales continuaban acumulándose a razón de 5.060%, más la suma estipulada de $17,700.00, por concepto de gastos, costas y honorarios de abogado. Finalmente, aseguró que la deuda estaba vencida y era líquida y exigible.

Luego de varios incidentes procesales, el 2 de noviembre de 2022, RMF presentó una *Moción Solicitando Referido a Mediación* mediante la cual solicitó que, conforme a la Ley Núm. 184-2012, según enmendada, conocida como *Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipoteca de una Vivienda Principal*, 32 LPRA sec. 2881, *et seq.* (Ley de Mediación Compulsoria) y por ser un requisito jurisdiccional, el pleito se refiera a proceso de mediación.[2] Atendida la solicitud, el 11 de noviembre de 2022, el TPI emitió una *Orden de Referido a Mediador Privado en Casos de Ejecución de Hipotecas* que se notificó el 17 de noviembre de 2022, ordenando la celebración de la mediación mediante un mediador privado para casos de ejecución de hipotecas.[3]

Posteriormente, se presentaron las debidas enmiendas para la sustitución de partes e incluir como herederos de la sucesión al Sr. Rafael Meléndez Silva, el Sr. José Meléndez Silva y la Sra. Milagros Meléndez Silva, quienes fueron emplazados mediante edicto y sustituir a la parte demandante-apelada por Longbridge Financial, LLC.[4] Así las cosas, el 30 de junio de 2023, el TPI emitió una *Orden*

---

[2] *Véase*, Entrada Núm. 16, SUMAC TPI.
[3] *Véase*, Entrada Núm. 17, SUMAC TPI.
[4] *Véase*, Entradas Núm. 20 y 29 respectivamente, SUMAC TPI.

que fue notificada el 11 de julio de 2023, mediante la cual se paralizaron los procedimientos ante el TPI, en espera del resultado de la mediación.[5]

Continuados los procedimientos de mediación y tras varios incidentes procesales, los cuales no son necesarios pormenorizar, el 11 de marzo de 2024, el mediador asignado presentó una *Moción Informativa* sometiendo su informe de la vista de mediación celebrada el 6 de marzo de 2024.[6] Mediante el aludido informe, el mediador señaló que a los apelantes se les requirió la entrega de una serie de documentos entre los que se encuentra una prueba de fondos. A tal requerimiento los apelantes acordaron que los documentos serían entregados en o antes del 22 de marzo de 2024. Además, se señaló la próxima sesión de mediación para el 14 de mayo de 2024.

Llegado el día de la sesión antes señalada, la parte apelante no se presentó a la misma, ello a pesar de haber sido debidamente citados y de que su representante legal confirmara el recibo de la citación. En su informe de la vista del 14 de mayo de 2024, el mediador indicó que el apelado informó que la sucesión Silva aún no había cumplido con la entrega de los documentos solicitados, por lo cual se devolvía el caso al TPI, para que este determinara como procedería el caso.[7] En respuesta, el 15 de mayo de 2024, los apelantes presentaron una *Moción Notificando Situación y Solicitud de Reconsideración*, en la cual ofrecieron sus excusas por la incomparecencia y solicitaron que se continuaran los procesos de mediación.[8] Además, indicaron que recopilaron los documentos solicitados y que lo único que se adeuda era el Relevo de Hacienda, para lo cual presentaron evidencia de que se estaba tramitando. En

---

[5] *Véase*, Entrada Núm. 28, SUMAC TPI.
[6] *Véase*, Entrada Núm. 37, SUMAC TPI.
[7] *Véase*, Entrada Núm. 39, SUMAC TPI.
[8] *Véase*, Entrada Núm. 42, SUMAC TPI.

respuesta a este escrito, el 24 de mayo de 2024, el apelado no presentó oposición a que se continuara el proceso de mediación.[9]

Así las cosas, el 29 de agosto de 2024, se continuaron los procesos de mediación. En el informe de esta vista que se presentó el 10 de septiembre de 2024, el mediador señaló que los documentos requeridos a la sucesión Silva para autorizar el proceso de mitigación de pérdida, aún no habían sido entregados y que los apelantes indicaron que ello fue debido a que aún se encontraban en trámites con el Departamento de Hacienda, para que se emitiera la planilla de caudal relicto y así poder continuar los procesos.[10] Nuevamente acordaron la entrega de algunos documentos para que el proceso de mitigación pudiese comenzar.

En su próximo informe presentado el 1 de noviembre de 2024, el mediador le informó al TPI que las partes indicaron la entrega de algunos documentos, entre los que se encuentra una carta de intención, sin embargo, aún faltan documentos para completar la instancia.[11] Adicional a ello, se informó que el 23 de octubre de 2024, se llevaría a cabo la tasación del inmueble y que esta se enviaría a los apelantes luego de que estos enviaran los documentos solicitados.

Posteriormente, el 16 de enero de 2025, el mediador presentó su *Moción Confidencial Informativa por parte del Mediador* de la sesión celebrada el 3 de diciembre de 2024.[12] Según surge de dicho informe, el apelado indicó que solo faltaba por entregar el documento de la evidencia de fondos para que se pudiese realizar la oferta de venta corta y que este proveería copia de la tasación que se realizó el 23 de octubre de 2024. Por su parte, los apelantes informaron que entregarían la evidencia de fondos en o antes del 11

---

[9] *Véase*, Entrada Núm. 44, SUMAC TPI.
[10] *Véase*, Entrada Núm. 49, SUMAC TPI.
[11] *Véase*, Entrada Núm. 51, SUMAC TPI.
[12] *Véase*, Entrada Núm. 53, SUMAC TPI

de diciembre de 2024. Así, con la anuencia de las partes, se señaló una próxima sesión de mediación para el 26 de febrero de 2025.

A tales efectos, el 26 de febrero de 2025, se continuaron los procesos de mediación. A esta sesión celebrada mediante videoconferencia, los apelantes no comparecieron. Según consta en la *Moción sometiendo Informe Confidencial del Mediador* que se presentó el 5 de marzo de 2025, dicha incomparecencia no fue justificada.[13] Particularmente, en el referido informe, el mediador indicó que **las partes habían acordado para una posible venta corta siempre y cuando la sucesión Silva sometiera toda la documentación relacionada a la evidencia de fondos, para este ser aprobado. El apelado informó que la parte apelante incumplió con la presentación de documentos que se requería para cualificar con la venta corta, en específico la entrega de la evidencia de fondos.** Por lo cual, la entidad prestataria les envió una notificación a los apelantes, el 21 de enero de 2025, en la cual denegaron la venta corta. Los apelantes, no se comunicaron con LF, luego de tal comunicación. A raíz de ello, el mediador solicitó al TPI que determinara los próximos pasos a seguir en el proceso de mediación.

Examinada la moción, el 20 de marzo de 2025, el TPI emitió una *Orden* que se notificó el 24 de marzo de 2025, donde la declaró No Ha Lugar.[14] En lo particular, dispuso que:

> La determinación de si se llevó o no a cabo el proceso de mediación la debe tomar e informar el mediador e informar el resultado al Tribunal. Se ordena al mediador informar el resultado del proceso de mediación al Tribunal. 10 días para cumplir.

Conforme a este mandato, el 25 de marzo de 2025, el mediador presentó una *Moción sometiendo Informe del Mediador y en cumplimiento de Orden.*[15] Allí, reiteró lo manifestado por LF en

---

[13] *Véase*, Entrada Núm. 55, SUMAC TPI.
[14] *Véase*, Entrada Núm. 56, SUMAC TPI.
[15] *Véase*, Entrada Núm. 57, SUMAC TPI.

cuanto a que los apelantes no habían cumplido con presentar la documentación requerida para evaluar la alternativa de venta corta de la propiedad. Así, esbozó que los apelantes tampoco habían realizado acciones afirmativas sobre la denegación de la alternativa escogida por ellos, la cual fue notificada el 21 de enero de 2025. Además, agregó que, ante la incomparecencia no justificada de los apelantes, resultaba que estos no estaban en disposición para cooperar y completar los documentos para poder ser evaluados. Por lo cual, dio por concluido el proceso de mediación conforme a la Ley de Mediación Compulsoria, *supra*.

En respuesta a este último informe, el 31 de marzo de 2025, los apelantes comparecieron ante el TPI mediante un escrito en el que ofrecieron disculpas por su incomparecencia, la cual atribuyeron a problemas con el internet.[16] Indicaron que, su incomparecencia no había sido premeditada y tampoco intencional, ni con el propósito de crear dilaciones. Sostuvieron que intentaron comunicarse con la oficina del mediador y que no fue hasta luego de celebrada la sesión que lograron comunicarse. Alegaron que se les informó que durante la sesión también habían confrontado problemas con el internet y que la vista se había celebrado un poco más tarde ese día. Sostuvieron que, a esta no hubiesen podido comparecer, pues tenían previamente acordada una reunión fuera de la oficina. Finalmente, en cuanto a las solicitudes del apelado relacionada a la entrega de documentos expresaron lo siguiente:

> [...]

> 7. Habíamos quedado en comparar tasaciones del valor de la propiedad. Pero, la parte demandada de manera unilateral primero no quería ofrecernos copia de la tasación realizada por ellos, luego pretendía que se aceptara de manera unilateral su tasación sin ofrecerle la oportunidad a la parte demandada de tasar la propiedad y aportar la suya antes de conocer si concuerdan en el valor.

---

[16] *Véase*, Entrada Núm. 58, SUMAC TPI.

8. La parte demandante pretende que se acepte su valor de tasación o no hay Venta Corta o "Short Sale", no es negociable. Ha requerido que se ofrezca la prueba de fondos sin antes haberse establecido el valor final a otorgarse a la propiedad para proceder con el financiamiento. Tampoco le han concedido tiempo a la parte demandada de tasar la propiedad, todo al tiempo apresurado de la parte demandante.

[...]

12. Una vez acordemos el valor final, entonces lo procedente seria ofrecer la prueba de fondos y de no tener la cantidad total ofrecer el término para gestionar el financiamiento de esta manera saldan la deuda.

[...]

14. La demandada está en posición de evidencia fondos luego de tasar la propiedad y establecer el valor final con la comparación de las tasaciones.

En vista de lo anterior, solicitaron que se continuaran los procesos de mediación, para ellos poder aportar su tasación y determinar por acuerdo entre las partes el valor final de la propiedad para realizar el pago correspondiente al apelado.

En respuesta, el 1 de abril de 2025, el mediador expresó que estaba dispuesto a continuar los procesos de mediación.[17] En consecuencia a ello, el 3 de abril de 2025, el TPI ordenó la continuación de los procedimientos de mediación.[18] Sin embargo, el 14 de abril de 2025, LF presentó una *Moción en Cumplimiento de Orden*, en la cual arguyó que los apelantes seleccionaron la alternativa de venta corta de herederos y que tal elección conllevaba que las tasaciones de los herederos no pudiesen ser utilizadas para considerar una oferta.[19] Adicional a ello, alegó que los apelantes no habían presentado aun la evidencia de fondos y que el valor de tasación fue notificado a la sucesión Silva y que dicha tasación expiraría el 21 de abril de 2025. Además, indicó que:

[...]

---

[17] *Véase*, Entrada Núm. 59, SUMAC TPI.
[18] *Véase*, Entrada Núm. 61, SUMAC TPI.
[19] *Véase*, Entrada Núm. 63, SUMAC TPI.

7. De los herederos continuar interesados en que se les evalúe para esta alternativa, deben reconocer y aceptar los términos anteriormente expuestos y que ya se les han explicado en varias ocasiones. Igualmente, toda vez que ya le fue denegada la alternativa y la tasación está próxima a expirar, deben estar de acuerdo en comenzar el proceso nuevamente desde cero y volver a dar acceso a la propiedad para tasar. La tasación realizada por Celink será la única a considerar para evaluar una posible oferta.

[...]

Continuados los procesos de mediación, el 30 de mayo de 2025, el mediador presentó su *Moción sometiendo Informe Confidencial del Mediador* de la sesión celebrada el 28 de mayo de 2025.[20] Se desprende del informe de la sesión que los documentos de los apelantes estaban vencidos y que aún no se había entregado la evidencia de fondos. Además, se indicó que la tasación estaba vencida por lo cual era necesario realizar una nueva, por lo que LF solicitó tiempo para hacerla. La sucesión Silva informó que recibieron del apelado los documentos vencidos, para que los mismos fuesen actualizados y evaluados. Las partes acordaron que los documentos actualizados serían entregados en o antes del 13 de junio de 2025 y que LF tendría hasta el 20 de julio de 2025 para realizar la nueva tasación del inmueble y que para esa misma fecha los apelantes debían someter la evidencia de fondos que solicitó el apelado.

Así las cosas, el 2 de julio de 2025, el mediador presentó una *Moción sometiendo Informe Confidencial del Mediador* sobre la reunión celebrada en esa misma fecha.[21] Según el informe, entre los asuntos pendientes se encontraba la certificación de la evidencia de los fondos conforme a 95% de la cantidad tasada de la propiedad y los documentos sometidos que, próximamente, podrían vencerse. Por lo que, se le concedió hasta el 11 de julio de 2025, para que los

---

[20] *Véase*, Entrada Núm. 66, SUMAC TPI.
[21] *Véase*, Entrada Núm. 68, SUMAC TPI.

apelantes entregaran todos los documentos pendientes de evaluación, incluyendo la certificación de fondos, usando la tasación de octubre del 2024.

Posteriormente, el 15 de septiembre de 2025, se llevó a cabo una nueva sesión de mediación.[22] Surge del informe de dicha sesión que se presentó el 19 de septiembre de 2025, que la representación legal de la sucesión Silva no había tenido ningún tipo de comunicación con estos respecto al estatus de la entrega de los documentos requeridos para poder adquirir el inmueble tasado y que intentará comunicarse con ellos para la toma de decisiones correctas sobre el caso. Por su parte, el apelado informó que no recibió la certificación de evidencia de fondos ni la carta de interés de adquirir el inmueble. Ante lo manifestado por LF y el incumplimiento de los apelantes con la entrega de los documentos requeridos para el proceso, se dio por concluido el proceso de mediación. A consecuencia de este informe, el 28 de septiembre de 2025, el TPI emitió una *Orden* que se notificó el 1 de octubre de 2025, solicitándole al apelado que se expresara del curso a seguir.[23]

En respuesta, el 15 de octubre de 2025, el apelado presentó una *Moción de Sentencia Sumaria.* [24] En primer lugar, enumeró los hechos que, a su juicio, no estaban en controversia. Particularmente, indicó que, la parte apelante no había presentado contestación a la demanda, sin embargo, había comparecido a mediación para concederle la oportunidad de completar la alternativa de venta corta. Sostuvo que el pleito se refirió a mediación en varias ocasiones y que durante este proceso se le orientó a la sucesión Silva de las alternativas de retención y disposición disponibles. Indicó que, ante ello, los apelantes

---

[22] *Véase*, Entrada Núm. 70, SUMAC TPI.
[23] *Véase*, Entrada Núm. 72, SUMAC TPI.
[24] *Véase*, Entrada Núm. 73, SUMAC TPI.

solicitaron ser evaluados para la alternativa de venta corta, no obstante, estos no completaron la documentación requerida para poder ser evaluados para dicha alternativa. Por motivo de ello, manifestó que el caso se devolvió al TPI, para que se continuaran los procesos. A tenor de lo antes expuesto, solicitó se dictara sentencia sumaria y se ordenara la ejecución de la hipoteca, luego de vencidos los términos legales aplicables.

El 5 de noviembre de 2025, los apelantes presentaron su oposición en la cual manifestaron que a su entender la medición no proveyó acciones y resultados indispensables para la sucesión Silva por lo cual solicitaron que se declarara No Ha Lugar la sentencia sumaria y que se celebrara juicio en su fondo o se regresara el caso a mediación compulsoria. [25]

Evaluados los escritos de las partes, el 2 de diciembre de 2025, el TPI dictó *Sentencia Sumaria,* la cual se notificó el 8 de diciembre de 2025, declarando Ha Lugar la *Moción de Sentencia Sumaria.*[26] Dicha sentencia fue notificada por edicto el 11 de diciembre de 2025.[27] En la referida sentencia el TPI hizo constar que, durante los procesos de mediación, la parte apelante no presentó la documentación requerida para que el apelado le evaluara para la alternativa de venta corta. Por lo cual, el caso fue devuelto ante su consideración, para la continuación de los procedimientos. Además, sostuvo que:

> […]
>
> [e]l préstamo se venció y está sujeto a repago ante el fallecimiento de la Deudora y la propiedad no es la residencia principal de algún deudor sobreviviente. LONGBRIDGE tiene derecho a declarar vencida la totalidad de la deuda y proceder a ejecutar la garantía inmobiliaria.
>
> La parte demandada no logró controvertir el Contrato ni mucho menos el consentimiento, objeto o causa de los

---

[25] *Véase*, Entrada Núm. 75, SUMAC TPI.
[26] *Véase*, Entrada Núm. 77, SUMAC TPI.
[27] *Véase*, Entrada Núm. 4, Anejo 1 del apéndice del recurso, SUMAC TA.

otorgantes, por lo que es ley entre las partes. Se desprende de los documentos acreditativos de la deuda anejados a la solicitud de sentencia sumaria, que se cumple una de las causas de aceleración.

Siendo la obligación reclamada en la demanda de las que nacen de la ley, de los contratos y de los cuasicontratos y de las que facultan al demandante para ejecutar las garantías de esta obligación y cobrar así las deudas con ellas garantizadas y de conformidad con los articulados del Código Civil, y la jurisprudencia antes citada, y no existiendo hechos en controversia, procede que se dicte Sentencia Sumaria a favor de la parte demandante y en contra de la parte demandada.

[...]

En desacuerdo, el 12 de enero de 2026, la sucesión Silva presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

**PRIMER ERROR SEÑALADO: ERRO EL TRIBUNAL DE PRIMERA INSTANCIA CON LA INTERPRETACIÓN A LA LEY 184-2012, AL NO PERMITIR QUE SE EVALUARA LA SEGUNDA TASACIÓN REALIZADA POR LA PARTE APELADA Y SE CONSTITUYERA UNA MEDIACIÓN EFECTIVA.**

**SEGUNDO ERROR SEÑALADO: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR SENTENCIA SUMARIA Y ORDENAR VENTA JUDICIAL SIN HABER PASADO JUICIO DE LAS OCURRENCIAS EN VISTAS DE MEDIACIÓN Y LOS SEÑALAMIENTOS MATERIALES EN CONTROVERSIA QUE IMPIDEN LA DISPOSICIÓN DEL LITIGIO POR LA VÍA SUMARÍA.**

Atendido el recurso, emitimos una *Resolución* concediéndole al apelado hasta el 2 de febrero de 2026, para presentar su postura en cuanto al mismo. Además, cabe precisar que, el 21 de enero de 2026, emitimos una *Resolución* solicitándole a la sucesión Silva que presentara evidencia de la notificación de la Sentencia publicada en periódico de circulación general. Se les concedió hasta el 23 de enero de 2026, para que cumplieran con dicha solicitud. Oportunamente, el mismo 21 de enero de 2026, el apelante presentó la evidencia solicitada. Posteriormente, el apelado compareció mediante un *Alegato de la Apelada* y negó que el TPI cometiera los errores imputados. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver el asunto ante nos. *Veamos.*

## II.

## -A-

En esencia, el principio rector de las Reglas de Procedimiento Civil es proveerles a las partes envueltas en un pleito legal, una solución justa, rápida y económica en todo procedimiento. Regla 1 de Procedimiento Civil, 32 LPRA Ap. V, R.1. El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, hace viable este objetivo en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita.

Conforme a la Regla 36.3 (e) de Procedimiento Civil, *supra,* se dictará sentencia sumaria "si las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y, además, si el derecho aplicable así lo justifica". A estos efectos, el foro judicial tiene la potestad para disponer de asuntos pendientes sin la necesidad de celebrar un juicio, esto debido a que lo que restaría sería aplicar el derecho a los hechos no controvertidos. *Roldan Flores v. M. Cuebas,* 199 DPR 664, 676 (2018).

Es menester destacar que, solo procede dictar sentencia sumaria cuando surge claramente que el promovido no puede prevalecer y que el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.,* 185 DPR 288, 299 (2012). Por lo tanto, no procede dictar sentencia sumaria cuando no existe una clara certeza sobre todos los hechos materiales en la controversia. Íd. Aun así, "[c]ualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una cuestión que permita

concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Aponte Valentín V. Pfizer Pharmaceuticals, LLC*, 208 DPR 263, 277 (2021).

En reiteradas ocasiones, el Tribunal Supremo ha establecido que se considera como un hecho esencial y pertinente, aquel que "puede afectar el resultado de la reclamación acorde con el derecho sustantivo aplicable". *Cruz Vélez v. CEE y otros*, 206 DPR 694, 745 (2021). Dicho esto, para que proceda una moción de sentencia sumaria no tan solo se requiere que haya una inexistencia de hechos en controversia, sino que también la sentencia que dicte el foro judicial tiene que proceder conforme al derecho sustantivo aplicable.

En particular, la Regla 36.2 de Procedimiento Civil, *supra*, permite que cualquier parte presente una moción, basada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación. Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". *Municipio de Añasco v. ASES et al.,* 188 DPR 307, 310 (2013).

Por su parte, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al., supra,* pág. 677. Por el contrario, esa persona viene obligada a enfrentar la moción de su adversatario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. *SLG Zapata- Rivera v. J.F. Montalvo*, 189 DPR 414, 432 (2013). Específicamente, la Regla 36.3 de

Procedimiento Civil, *supra,* expone los criterios que debe cumplir la parte que se opone a la moción de sentencia sumaria. Al amparo de dicha regla, la oposición a la solicitud de sentencia sumaria el promovido debe, como parte de su carga desglosar los hechos sobre los que aduce que no existe controversia, y, además para cada uno de ellos debe especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.

Según dispone el caso de *Mejías et al. v. Carrasquillo et al., supra,* pág. 300 citando a: *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 280-281 (1990), "al evaluar una moción de sentencia sumaria, los jueces no están limitados por los hechos o documentos que se aduzcan en la solicitud, sino que deben considerar todos los documentos en autos, sean o no parte de la solicitud de sentencia sumaria de los cuales surjan admisiones hechas por las partes".

En síntesis, no procede dictar sentencia sumaria cuando: (1) existen hechos materiales y esenciales en controversia; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción de sentencia sumaria una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra,* 186 DPR 713, 757 (2012). Además, no se debe adjudicar un caso sumariamente cuando existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor credibilidad es esencial y está en disputa. *Const. Jose Carro v. Mun. Dorado,* 186 DPR 113, 129 (2012).

Ahora bien, según *Verá v. Dr. Bravo,* 161 DPR 308, 334-335 (2004) este Foro Apelativo utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una sentencia sumaria. Sin embargo, el Tribunal Supremo especifica que, al revisar la determinación de primera instancia sólo podemos considerar los documentos que se presentaron ante el TPI. Íd. Lo

anterior, debido a que "las partes no pueden añadir en apelación *exhibits*, deposiciones o affidávits que no fueron presentadas oportunamente en el foro de primera instancia, ni pueden esbozar teorías nuevas o esgrimir asuntos nuevos por primera vez ante el foro apelativo". Íd. Además, sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. Íd. Es decir, no podemos adjudicar los hechos materiales y esenciales en disputa, ya que esta tarea le corresponde al Tribunal de Primera Instancia. Íd.

Por otro lado, en *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015), el Tribunal Supremo estableció que al revisar una determinación del foro primario en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho. *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

**-B-**

Las obligaciones surgen de la ley, los contratos, cuasicontratos y de cualquier otra acción u omisión en la cual medie culpa o negligencia. Art. 1042 del Código Civil, 31 LPRA ant. sec. 2992.[28] **Aquellas obligaciones derivadas de un contrato tendrán**

---

[28] Resaltamos que el cuerpo legal vigente en el momento que las partes contrataron era el Código Civil del 1930.

**fuerza de ley para las partes, y deberán cumplirse según se hayan delimitado;** *pacta sunt servanda.* (Énfasis suplido) Art. 1044 del Código Civil, 31 LPRA ant. sec. 2994. Los contratos son negocios jurídicos que existen desde que concurren los requisitos de consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 LPRA ant. sec. 3391. Una vez las partes consienten en obligarse a cumplir determinadas prestaciones, surge el contrato. Art. 1206 del Código Civil, 31 LPRA ant. sec. 3371; *Amador v. Conc. Igl. Univ. De Jesucristo,* 150 DPR 571, 581-582 (2000). En tal sentido, **una vez perfeccionado el contrato, las partes se obligan no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza estén conformes con la buena fe, el uso y la ley.** (Énfasis suplido) Art. 1210 del Código Civil, 31 LPRA ant. sec. 3375. Consecuentemente, los tribunales no podemos relevar a una parte de cumplir con el contrato cuando éste es legal y válido y no contiene vicio alguno. *Mercado, Quilichini v. U.C.P.R.,* 143 DPR 610, 627 (1997).

## -C-

La Ley de Mediación Compulsoria, *supra*, se aprobó "con el propósito de crear un proceso de mediación compulsoria ante los tribunales de Puerto Rico o ante los foros administrativos correspondientes, previo a llevar un proceso de ejecución de hipoteca (foreclousure) de cualquier propiedad principal de vivienda en Puerto Rico por cualquier entidad bancaria". Exposición de Motivos de la Ley de Mediación Compulsoria, *supra*. El proceso de mediación compulsoria se implementó para proteger la residencia principal de los deudores hipotecarios ante los efectos de la crisis económica que enfrenta Puerto Rico. *Scotiabank v. SLG Rosario-Castro,* 205 DPR 537,547(2020).

En atención a ese propósito protector y con el fin de atender deficiencias identificadas en la práctica del proceso de mediación, la

Asamblea Legislativa aprobó la Ley Núm. 38-2019, mediante la cual se enmendó el Art. 3 de la Ley de Mediación Compulsoria, *supra.* Esta enmienda tuvo como objetivo precisar y reforzar las obligaciones procesales de las partes durante la mediación hipotecaria, particularmente en lo concerniente a la producción oportuna de documentos, la comparecencia al proceso y las consecuencias jurídicas derivadas del incumplimiento de dichas obligaciones, según se expone a continuación:

> [s]erá deber del Tribunal, al presentarse la demanda y diligenciarse el emplazamiento, citar a las partes a una vista o acto de mediación compulsoria que presidirá un mediador seleccionado por las partes y que tendrá lugar en cualquier salón o sala del tribunal o en aquel lugar que las partes en acuerdo con el mediador seleccionen, en la cual se le informará al deudor hipotecario todas las alternativas disponibles en el mercado para poder evitar la privación del inmueble al deudor, ejecución de la hipoteca o la venta judicial de una propiedad residencial que constituya una vivienda principal, incluyendo aquellas alternativas que no dependen de la capacidad económica del deudor, como lo son la venta corta ("short sale"), la dación en pago, entrega voluntaria de título, y otros remedios que eviten que el deudor pierda su hogar o que, de perderlo, se minimicen las consecuencias negativas sobre el deudor.
>
> [...]
>
> **En dicha vista o acto de mediación, el acreedor hipotecario entregará al deudor hipotecario, una lista de los documentos necesarios y pendientes, si alguno, para evaluar la(s) alternativa(s) que puedan ser aplicables al caso del deudor hipotecario, quien entregará los documentos solicitados en un tiempo razonable, cumpliendo con la reglamentación federal aplicable. Antes de la siguiente vista o acto de mediación correspondiente, deberá entregar los documentos solicitados en una primera vista, o en su defecto, evidencia de que está haciendo las gestiones para obtener los referidos documentos. Si el deudor hipotecario incumple con su obligación de someter los documentos solicitados, dentro de un tiempo razonable y sin justa causa, se entenderá que ha desistido del proceso de mediación compulsoria, y en tal caso, el Tribunal continuará el proceso judicial iniciado por el acreedor hipotecario.** El incumplimiento de cualquiera de las partes a producir documentos para la primera sesión no será motivo para terminar la mediación. El representante del acreedor o inversionista le informará al deudor para cuales de las alternativas cualifica y se le explicarán las razones para no estar disponibles las alternativas para las que no cualifique.

[...]

**De no presentarse el deudor hipotecario al procedimiento de mediación en cualquiera de sus etapas, sin que medie justificación adecuada; de no entregar al acreedor los documentos solicitados en un tiempo razonable, según lo dispuesto en este Artículo**, o de no cumplir con el acuerdo alcanzado con el acreedor hipotecario como resultado del proceso de mediación, **se presumirá que voluntariamente el deudor hipotecario ha desistido del proceso de mediación compulsoria y dicho acreedor hipotecario procederá con la continuación del proceso de ejecución hipotecaria según corresponda, incluyendo sin limitarse, a solicitar cualquier remedio que en derecho proceda o disponible en las Reglas de Procedimiento Civil de Puerto Rico y dicho acreedor actuará de la forma acordada en el contrato o pagaré efectuado el día de la transacción original de hipoteca**. [...] (Énfasis suplido)

III.

De entrada, resolvemos que procede confirmar la *Sentencia Sumaria* dictada por el TPI, toda vez que el expediente demuestra de forma clara, reiterada y documentada que la parte apelante incumplió con los requisitos impuestos por la Ley de Mediación Compulsoria, *supra,* a pesar de haber sido referida al proceso de mediación en múltiples ocasiones y de habérsele concedido términos razonables y prórrogas adicionales para cumplir con sus obligaciones estatutarias. Contrario a lo alegado por los apelantes, el proceso de mediación no fue insuficiente ni inefectivo; por el contrario, se extendió por más de dos (2) años y se caracterizó por una amplia flexibilidad procesal por parte del TPI y del mediador asignado, todo en estricto cumplimiento con el propósito protector de la Ley.

Del expediente surge que el caso fue referido a mediación compulsoria desde noviembre de 2022 y que, a partir de entonces, se celebraron múltiples sesiones de mediación durante los años 2023, 2024 y 2025. En dichas sesiones, la parte apelante fue orientada de manera reiterada sobre las alternativas disponibles para evitar la ejecución hipotecaria y, tras recibir dicha orientación,

seleccionó voluntariamente la alternativa de venta corta. En cumplimiento con la Ley de Mediación Compulsoria, *supra*, el acreedor hipotecario entregó a los apelantes la lista de documentos necesarios para evaluar esa alternativa y se les concedieron múltiples términos para su entrega. No obstante, de forma consistente y reiterada, los apelantes incumplieron con la producción completa y oportuna de dicha documentación, particularmente con la evidencia de fondos, documento indispensable para que el apelado pudiera evaluar una oferta de venta corta.

Particularmente y contrario a lo expresado por los apelantes en su escrito, surge del expediente del caso que se celebraron al menos siete (7) reuniones de mediación, para las cuales se presentaron sus respectivos informes. En lo pertinente, surge que se le solicitó a la sucesión Silva que hiciera entrega de la evidencia de suficiencia de fondos, y estos acordaron entregarla desde la sesión de mediación del 6 de marzo de 2024. Posteriormente, en la sesión de mediación del 3 de diciembre de 2024, los apelantes confirmaron que entregarían la evidencia de suficiencia de fondos en o antes del miércoles, 11 de diciembre de 2024, lo cual incumplieron. Cabe destacar que, a la fecha de la última sesión registrada, el 19 de septiembre de 2025, tanto la evidencia de fondos, como los documentos vencidos aún no habían sido entregados a los apelados.

Además, a lo largo de los procesos de mediación, el mediador consignó en sus informes que, en varias ocasiones, los apelantes tampoco comparecieron a sesiones de mediación debidamente señaladas. Particularmente, consta que no comparecieron a la sesión del 14 de mayo de 2024, a pesar de haber sido debidamente citados, y nuevamente incumplieron con su comparecencia a la sesión del 26 de febrero de 2025, sin justificación adecuada, según

consignado expresamente por el mediador. Estos incumplimientos, considerados de forma aislada y, con mayor razón, en su conjunto, activan la presunción estatutaria de desistimiento voluntario del proceso de mediación compulsoria dispuesta en el Art. 3 de la Ley de Mediación Compulsoria, *supra.*

En este contexto, carece de mérito el primer señalamiento de error, mediante el cual los apelantes alegan que el TPI erró al no permitir que se evaluara una segunda tasación realizada por ellos y que, por ello, no se constituyó una mediación efectiva. El expediente demuestra que los apelantes seleccionaron la alternativa de venta corta de herederos, modalidad que conlleva, conforme fue explicado durante la mediación, que la tasación válida para fines de evaluación sea la realizada por o para el acreedor hipotecario. La Ley de Mediación Compulsoria, *supra,* no impone al acreedor la obligación de aceptar tasaciones privadas del deudor ni condiciona la entrega de la evidencia de fondos a la negociación previa del valor final del inmueble. Pretender lo contrario equivale a imponer requisitos no contemplados por la Ley y a subordinar el cumplimiento de obligaciones estatutarias básicas a condiciones unilaterales impuestas por el deudor hipotecario.

De igual forma, no tiene mérito el segundo error señalado. Una vez la parte apelante incumple reiteradamente con su deber de entregar los documentos requeridos y de comparecer al proceso de mediación, sin justa causa, el Art. 3 de la Ley de Mediación Compulsoria, *supra,* faculta expresamente al acreedor hipotecario a continuar con el proceso judicial de ejecución. En este caso, los apelantes no controvirtieron la existencia de la deuda, la validez del contrato hipotecario ni la ocurrencia de la causa de aceleración. Tal como correctamente concluyó el TPI, no existían hechos materiales en controversia que impidieran la adjudicación del pleito por la vía sumaria, y el historial procesal reflejaba que el requisito

jurisdiccional de la mediación compulsoria había sido ampliamente satisfecho y, eventualmente, válidamente concluido por incumplimiento del deudor.

Confirmar la sentencia recurrida es consistente tanto con el texto expreso de la Ley de Mediación Compulsoria, *supra*, como con su propósito legislativo. Dicho estatuto fue concebido para proteger a los deudores hipotecarios diligentes y de buena fe, no para permitir que el proceso de mediación se utilice como un mecanismo de dilación indefinida mediante incumplimientos reiterados y condicionamientos unilaterales. En el presente caso, el TPI actuó con mesura, prudencia y deferencia al espíritu de la Ley, concediendo oportunidades que excedieron ampliamente lo exigido por el estatuto. Esto, máxime cuando no se ha presentado la contestación a la demanda ni los apelantes han acreditado que el inmueble es su residencia principal. Ante el claro historial de incumplimiento de la parte apelante, procedía, como cuestión de derecho, dictar sentencia sumaria y ordenar la continuación del proceso de ejecución hipotecaria, por lo que la determinación recurrida debe ser confirmada.

IV.

Por los fundamentos que expondremos a continuación, **confirmamos** el dictamen apelado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones